UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                                       :
UNITED STATES OF AMERICA,                                              :        08-CV-244 (ARR)(RML)
                                                                       :
                        Plaintiff,                                     :        NOT FOR ELECTRONIC
                                                                       :        OR PRINT PUBLICATION
            -against-                                                  :
                                                                       :        OPINION AND ORDER
MARK GRAY,                                                             :
                                                                       :
                        Defendant.                                     :
                                                                       :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

        The Internal Revenue Code requires employers to withhold income tax from employees'

salaries, and remit such withholding taxes to the IRS on a quarterly basis. See 26 U.S.C. §

7501(a); 26 C.F.R. § 31.6011(a)-4. The company at issue in this case, CAT-ECG Medical

Services, P.C. ("CAT"), did not pay its withholding taxes for four quarterly periods in 2001 and

2002. The question in this case is, who is responsible for those unpaid taxes? The Internal

Revenue Code imposes personal liability on persons responsible for collecting, accounting for,

and remitting withholding taxes to the IRS who willfully fail to do so. 26 U.S.C. § 6672. A

delegate of the Secretary of the Treasury made assessments against Mark Gray ("defendant" or

"Gray"), an individual who worked for CAT during the relevant period. The United States

alleges Gray is a responsible person under the statute and that he willfully failed to pay

withholding taxes. Gray contends that by virtue of lack of authority within the company, he was

not responsible for the withholding taxes, and, moreover, did not possess the requisite knowledge

of the company's debts to the IRS to have willfully violated the statute. He therefore argues that

1

he should not be held personally liable.  Both parties now move for summary judgment.  For the

reasons explained below, both parties' motions are denied.

## BACKGROUND

CAT was a corporation engaged in providing medical diagnostic, cardiologic and

neurological testing services to skilled nursing facilities and medical offices.  United States'

Local Rule 56.1(a) Statement [Statement of Material Facts as to Which There is No Genuine

Issue to be Tried], Dkt. #53-1 ("USA Undisputed Facts") ¶ 3; Mark Gray's Local Rule 56.1(a)

Statement [Statement of Material Facts as to Which There is No Genuine Issue to be Tried], Dkt.

#54-3 ("Gray Undisputed Facts") ¶ 1.  An Asset Purchase Agreement produced by the United

States, but disputed in part by Gray, states that Comprehensive Medical Diagnostic Group, Inc., a

publicly traded company, purchased the assets of CAT on August 2, 2000, and created a

subsidiary known as Diagnostic Management Holding Group, Inc. ("DMG") to own and manage

CAT.  USA Undisputed Facts ¶ 6; see Mark Gray's Local Rule 53.1(b) Statement [Statement of

Disputed Material Facts], Dkt. #54-4 ("Gray Disputed Facts") ¶ 5-6.  That Asset Purchase

Agreement also stated:

> In connection with the acquisition, as of August 2, 2000, DMG entered into a one
> year employment agreement with Mark Gray, a former vice-president of CAT at
> an annual salary of $100,000 and an annual incentive bonus of 10,000 shares of
> the Company's common stock for each year Mr. Gray's employment agreement is
> extended.  Mr. Gray will serve as DMG's director of cardiac testing services.

Id.  The United States asserts that Gray ultimately received 75,000 shares of common stock in the

company as part of his employment agreement.  USA Undisputed Facts ¶ 7; accord Notice of

Mot. for Summ. J. by United States, Ex. I, Dkt. #53-18.  Gray counters that he never received the

shares and that "the distribution of shares was part of a proposed agreement which did not ever

come into effect." Gray Disputed Facts ¶ 7; see Gray's Mot. for Summ. J., Aff. of Mark Gray, Dkt. #54-1, ¶ 2. Nevertheless, it is clear that Gray worked for CAT from early 2000 to July of 2002, either as an employee or a consultant. Compare USA Undisputed Facts ¶ 12 with Gray Disputed Facts ¶ 12.

The facts about Gray's role in the company, however, are largely in dispute. The United States contends Gray held the title of vice president at CAT and was responsible for day-to-day office management including administration of the company's financial affairs. United States Undisputed Facts ¶¶ 12, 14. The United States asserts Gray had check-signing authority, which he exercised regularly, approved purchase orders for the company, and had the power to hire and fire employees. Id. ¶¶ 13, 15, 17. The United States further asserts that Gray had knowledge of CAT's unpaid tax liabilities, since he was solely responsible for opening mail received at CAT's Lynbrook, New York office, id. ¶ 23, he fielded calls from creditors, id. ¶ 26, and employees' paychecks bounced, making it obvious to employees, including Gray, that the company was experiencing cash flow problems, id. ¶ 25. Gray vigorously denies the United States' claim that he had substantial authority within the company, see Gray Undisputed Facts ¶¶ 12-15, 17-18, and that he had knowledge of CAT's tax liabilities, id. ¶¶ 23, 25-26.

Both parties submit affidavits and deposition excerpts[1] to support their respective motions for summary judgment and resist their opponent's motions. The relevant evidence from those affidavits and deposition excepts is as follows:

---

[1]Although the court ordered that the United States file "complete copies of the depositions of Mark Gray, Barbara Blumenfeld, Karin Croce, and Robert Goodman," Dkt. #50, at 3, the United States failed to do so. In addition, Gray appears to cite other depositions and affidavits in his affidavit, without providing the deposition transcripts. The court has therefore evaluated only the evidence presented to the court with the cross-motions.

Jason P. Magrill, a former CAT employee, stated that the company experienced cash flow problems during Gray's tenure. United States Mot. for Summ. J., Magrill Decl., Dkt. #53-26, ¶ 1(a)-(d).[2] Magrill further stated that Gray served as CAT's "vice president and office manager," id. ¶ 2, and that Gray fielded inquiries by creditors about when they would be paid, id. ¶ 1(e), and opened all mail from taxing authorities, id. ¶ 3.

Barbara Blumenfeld testified that she would calculate employees' hours based on their time cards and then hand those cards to Gray. Id., Blumenfeld Dep., Dkt. #53-27, at 12. She said she "guess[ed]" that Gray would then "call payroll in." Id. Blumenfeld characterized Gray as an "office manager" and said he was involved in "hiring and collaboration with others." Id. at 19. Blumenfeld testified that sometimes she would make deposits at the bank and sometimes Gray would do it – "whoever was going to the bank would make the deposit." Id. at 25. She stated that there came a time when she perceived that CAT may have been experiencing cash flow problems, since payroll checks bounced "[a] few times." Id.

Karen Croce testified that Gray had the authority to hire and fire employees, and that when she interviewed a prospective employee for her staff, she would speak to Gray and he would "either authorize it or not authorize it." Id., Croce Dep., Dkt. #53-28, at 13. According to Croce, Gray had "the final say" regarding these hiring and firing decisions. Id. When asked whether Gray held a title like president, vice president, treasurer, or secretary, Croce stated, "As far as I'm concerned, Mr. Gray was the office manager." Id. at 14; accord id. at 29. Croce did

---

[2]Gray objects to the Magrill declaration, as he did previously, which he argues was produced after the discovery period ended. Dkt. #54-2, at 3. However, Magistrate Judge Robert M. Levy addressed this issue with Gray at a discovery hearing on January 24, 2013, and Gray withdrew his request to depose Magrill. The court therefore considers the declaration as part of the record on the motion.

not know to whom Gray reported or whether he had the authority to sign payroll checks. Id. at

14-15. However, she was aware that CAT's payroll checks bounced "a couple of times." Id. at

15. Croce testified that the office manager, i.e. Gray, "always" opened the company's mail. Id.

at 21. She further testified that when Gray became office manager, his office was located "on the

management side" of the building. Id. at 28.

Gray himself testified that he signed checks and acquired "check-signing authority" in

2001. Id., Gray Dep., Dkt. #53-29, at 28. However, when asked about the process Gray would

go through to sign checks, the following testimony ensued:

> Q:    Now, if you did have to exercise that check-signing . . . authority, walk me
>        through; how did that come to be?
>        Did you get a call from the office saying Mr. [David] Schick needs . . . you [to]
> sign a check, or did Mr. Schick call you and tell you that a check needed to be signed?
> A:     It was both. If Mr. Schick called me, I signed it. If the office called me, then I
>        would call Mr. Schick and say, is it okay to sign a check.
> Q:    And then he would either tell you yes or no, correct?
> A:     Correct.
> Q:    Did he ever say, you decide?
> A:     No.

Id. at 30.

Gray submitted an affidavit in support of his motion for summary judgment, in which he

stated: he was never an officer of the company and had no authority or control over the company,

Mot. for Summ. J. by Mark Gray, Aff. of Mark Gray ¶ 1; he never held an executive title or had

any involvement in the financial aspects of the company, id.; he never received the shares

indicated in the Employment Agreement, id. ¶ 2; he was not, in fact, employed by the company at

all, but rather was an independent contractor, id. ¶ 5; he made decisions only as directed by

members of the management, such as David Schick and Shaya Ostrov, id. ¶¶ 5-6; he used the

5

title of vice president on only one isolated occasion to open a bank account for the company, and the title never gave him any actual authority to act on the company's behalf, id. ¶ 7; his hiring and firing decisions were only for low-level positions, while Dr. Robert Goodman retained authority to hire and fire management, id. ¶ 10; he was not responsible for opening mail, id. ¶ 16; he never opened any correspondence from the IRS concerning unpaid payroll taxes, id. ¶ 17; and, he was not the only person at CAT who fielded calls from creditors – Magrill, Croce, and Blumenfeld did so as well, id. ¶ 19.

Gray also submitted an affidavit of David Schick, in which he stated that "[t]he taxpayer," referring to Gray, "was never a shareholder or corporate officer of the company," id., Schick Aff. ¶ 2; never signed any of the company's tax returns, id. ¶ 4; and, to the best of Schick's knowledge, did not sign any checks to pay creditors after Goodman informed Gray that payroll taxes were owed to the IRS, id. ¶¶ 5-6. Schick also stated, "I, in consultation with the other investor owners[,] made all decisions as to which creditors should be paid . . . . [T]he taxpayer was not involved in these decisions." Id. ¶ 8.[3]

Gray also submitted a declaration of Shaya Ostrov, a "founder and President of CAT." Id., Decl. of Shaya Ostrov ¶ 1. Ostrov stated, "With respect to CAT . . . Mark Gray was hired as a consultant to oversee the technical aspects of the operations, to carry out sales and marketing for the companies. . . . Gray had no authority to legally obligate the companies; was never a Director; had no financial control; never held a substantive Executive title, nor did he have . . . involvement in any financial aspects of the company." Id. ¶¶ 2-3. Ostrov also stated, "To the

_____

[3]This paragraph of the affidavit contains a handwritten alteration initialed by "DS," which the court assumes is Schick.

6

best of my knowledge, the shares in [CAT] that were offered to Mark Gray were never delivered to him." Id. ¶ 4. He further stated, "No decisions with respect to hiring and firing and finances, including but not limited to payment of bills, employees and taxes, were made by Mark Gray." Id. ¶ 5.

In addition to affidavits and deposition excerpts, the United States submitted, inter alia, the certificates of assessment from the IRS for the periods ending March 31, 2001, and June 30, 2001, United States Mot. for Summ. J., Ex. A; a schedule of payments showing Gray received a total of $72,000 in compensation from September 7, 1999, to March 28, 2001, id., Ex. E; a list of checks endorsed to Gray totaling $16,997.59 from February 20, 2000, to March 13, 2001, id.; many copies of CAT checks signed by Gray, id., Exs. E-F; a business card listing Gray's title as "Vice President," id., Ex. K; affidavits from several employees given in response to the IRS's investigation of Dr. Goodman, which state that Gray and Schick were "in charge of the operation of the practice, including the financial administration thereof," id., Ex. N; a form 8-K filed with the Securities and Exchange Commission by Comprehensive Medical Diagnostics Group, Inc., upon its purchase of CAT's assets, restating the agreement with Gray for one year of employment as "director of cardiac testing services" at a salary of $100,000 and an annual incentive bonus of 10,000 shares of common stock, id., Ex. P, at 5.

On this record, the parties now cross-move for summary judgment, with each side opposing the other's motion.

**DISCUSSION**

I.    *Relevant Law*

    a.    <u>Statutory Framework</u>

The Internal Revenue Code requires that employers deduct and withhold taxes from their

employees' wages, and hold such withholding taxes in trust for the United States. 26 U.S.C. §§

3402, 7501. Section 6672 of the Code provides:

> Any person required to collect, truthfully account for, and pay over any tax
> imposed by this title who willfully fails to collect such tax, or truthfully account
> for and pay over such tax, or willfully attempts in any manner to evade or defeat
> any such tax or the payment thereof, shall, in addition to other penalties provided
> by law, be liable to a penalty equal to the total amount of the tax evaded, or not
> collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). Under this section, "an individual may be held [personally] liable for

unpaid withholding taxes if: (1) he or she was a 'responsible person' for collection and payment

of the employer's taxes; and (2) he or she 'willfully' failed" to hold and remit the taxes to the

IRS. <u>Winter v. United States</u>, 196 F.3d 339, 344 (2d Cir. 1999) (quoting <u>Fiataruolo v. United

States</u>, 8 F.3d 930, 938 (2d Cir. 1993)). "The person against whom the IRS assesses a § 6672 tax

penalty has the burden of disproving, by a preponderance of the evidence, the existence of one of

these two elements." <u>Id.</u> at 344-45 (internal quotation marks omitted).

        1.    Responsible Person

Courts take "a broad view of who qualifies as responsible person" under § 6672.

<u>Fiataruolo</u>, 8 F.3d at 938. More than one person may be a responsible person within the meaning

of the statute. <u>United States v. Rem</u>, 38 F.3d 634, 642 (2d Cir. 1994). The Second Circuit has

made clear that "it is not necessary that the individual in question 'have the final word as to

8

which creditors should be paid in order to be subject to liability under this section.'" Id. (quoting

Hochstein v. United States, 900 F.2d 543, 547 (2d Cir. 1990)). Rather, "[t]he determinative

question is whether the individual has significant control over the enterprise's finances." Id.

(internal quotation marks omitted); accord Winter, 196 F.3d at 347 (taxpayer's argument that he

did not have "ultimate authority" over whether withholding tax would be paid did not preclude

finding, as a matter of law, that he had "significant control"). The Circuit has instructed that

courts consider the following relevant factors in determining whether an individual had

significant control:

> [W]hether the individual (1) is an officer or member of the board of directors, (2)
> owns shares or possesses an entrepreneurial stake in the company, (3) is active in
> the management of day-to-day affairs of the company, (4) has the ability to hire
> and fire employees, (5) makes decisions regarding which, when and in what order
> outstanding debts or taxes will be paid, (6) exercises control over daily bank
> accounts and disbursement records, and (7) has check-signing authority.

Rem, 38 F.3d at 642 (quoting Fiataruolo, 8 F.3d at 939) (internal quotation marks omitted).

None of these factors is dispositive in evaluating whether an individual had significant control;

the factors should be considered as part of an assessment of the "totality of the circumstances."

Fiataruolo, 8 F.3d at 939. Mere "technical authority or titular designation," id. (internal

quotation marks omitted), will not suffice to render an individual a responsible person if that

authority is not accompanied by significant control such that the individual could have

"prevent[ed] the [tax] default from occurring," id. (second alteration in original) (internal

quotation marks omitted); accord id. at 646 (Leval, J., concurring) ("Congress refrained from

imposing liability on all available targets. It did not, for example, impose liability on all officers,

directors and stockholders of the delinquent corporation; it limited the liability to those

9

persons . . . who bore responsibility for seeing to it that the tax payments were made.").

Nevertheless, "it remains the individual's burden to show that actual authority was more limited

than technical authority." United States v. Landau, 155 F.3d 93, 103 (2d Cir. 1998).

        2.     Willfulness

      As to the willfulness element, willful conduct "need not stem from an 'evil motive or

intent to defraud,' but it must amount to more than negligence." Rem, 38 F.3d at 643 (internal

citation omitted) (quoting Kalb v. United States, 505 F.2d 506, 511 (2d Cir. 1974)). "The

principal component of willfulness is knowledge: a responsible person acted willfully within the

meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and

(b) knew that company funds were being used for other purposes instead." Id. A responsible

person's failure to cause the withholding taxes to be paid is not willful, however, "if he believed

that the taxes were in fact being paid, so long as that belief was, in the circumstances, a

reasonable one." Id.

        b.    Summary Judgment Standard

      "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The function of the court is not to resolve disputed issues, but to determine

whether there is a genuine issue to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be

resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it

concerns facts that can affect the outcome under the applicable substantive law." McPherson v.

10

Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation marks and ellipses omitted)).

In assessing whether summary judgment is appropriate, the court considers "'the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits.'" Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-4 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment against it, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998); accord Celotex Corp., 477 U.S. at 324 (if moving party shows absence of a genuine issue of material fact, nonmoving party must "go beyond the pleadings" and identify facts that show a genuine issue for trial). In reviewing the record before it, "the court is required resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (citing Anderson, 477 U.S. at 255).

Applying these principle to a § 6672(a) dispute, "summary judgment may be appropriate where there are no questions as to either the assessed individuals' control of company funds and decisionmaking authority or his knowledge of the deflection to payees other than IRS of funds that could be used to pay withholding taxes." Rem, 38 F.3d at 644.

11

II.   *Statute of Limitations*

Gray contends that the statute of limitations bars the IRS from assessing the penalties against him. The IRS assessed the first penalty on November 18, 2004, for quarterly employment tax periods ending March 31, 2001, and June 30, 2001, respectively. Mot. for Summ. J. by Mark Gray, Ex. A, B.. The IRS assessed the second penalty on April 10, 2006, for quarterly employment tax periods ending March 31, 2002, and June 30, 2002, respectively. Id. Since the statute of limitations for assessment of tax penalties is three years, see 26 U.S.C. § 6501(a), Gray argues, these assessments were made outside of the three-year period and are therefore time barred. Dkt. #54-2, at 2-3.

"A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint." Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 751-52 (2d Cir. 1992) (citing Fed. R. Civ. P. 8(c)). Gray did not raise the statute of limitations defense in his answer to the complaint. See Dkt. #10. Instead, he raised it for the first time in his motion for summary judgment. Accordingly, the statute of limitations defense is waived and cannot be raised at this stage of the litigation. See Landau, 155 F.3d at 107 (holding statute of limitations waived in § 6672(a) case when raised on the first time in motion for summary judgment).

Even if it were not waived, however, Gray's argument that the assessments are barred by the statute of limitations is incorrect. For the purposes of the Internal Revenue Code's statute of limitations, if a return of "employment and withholding taxes . . . is filed before April 15 of the succeeding calendar year, such return shall be considered filed on April 15 of such calendar year." 26 U.S.C. § 6501(b)(2); see In re Becker, 407 F.3d 89, 96 (2d Cir. 2005) ("As to

12

withholding taxes due with respect to a given calendar year, the statute of limitations begins to

run on April 15 of the following year. The limitations period for assessing 'responsible person'

liabilities is substantially the same.") (internal citation omitted). The statute of limitations on the

first penalty therefore began to run on April 15, 2002 – less than three years before the penalty

was assessed on November 18, 2004. The statute of limitations on the second penalty began to

run on April 15, 2003 – less than three years before the penalty was assessed on April 10, 2006.

Consequently, both assessments are timely.

III.    *Liability*

        (a)    *Responsible Person*

        On the record before the court, there is plainly a genuine issue of material fact about

whether Gray exercised significant control over CAT's finances. At its most basic level, the

factual dispute boils down to Gray's denial of the United States' assertions about his authority in

the company. The United States characterizes Gray's affidavit and deposition testimony as "self-

serving," and argues that it is contradicted by evidence produced in support of its motion for

summary judgment. United States' Opp'n to Def. Gray's Cross-Mot. for Summ. J. as Well as

Reply Re: United States' Mot. for Summ. J, Dkt. #56, 6-7. But to the extent Gray's account is

rendered less credible by such contradictions, such a determination may not be decided on

summary judgment. See Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005)

("Assessments of credibility and choices between conflicting versions of events are matters for

the jury, not the court on summary judgment.") (internal quotation marks omitted). Further,

Gray produced more evidence than just his own affidavit and deposition testimony. The United

States barely addresses the affidavits of Schick and Ostrov, both of which support Gray's

13

contention that he was not in a position at CAT to exercise significant control over the company's finances. Moreover, even the evidence adduced by the United States in support of its motion presents some questions about Gray's authority. The combined testimony of Magrill, Blumenfeld, and Croce, for example, show at most that Gray acted primarily as an office manager (albeit with an office on the "management side of the building"), was involved in hiring and firing of employees, and played a role in delivering employees' time cards to payroll. These facts, without more, suggest a possibility that Gray was in a position to exercise significant control over CAT's finances, but they are far from being conclusive of Gray's authority as a matter of law.

Indeed, when taking all of the evidence into account, including Gray's deposition testimony and affidavit, it becomes clear that virtually every factor identified by the Second Circuit as being relevant to the court's determination of whether Gray exercised significant control is disputed: First, as to whether Gray was an officer or member of the board: Magrill's affidavit and the business card support the United States' assertion that Gray was CAT's vice president, but Gray testifies that the title was given to him for a limited purpose and conveyed no additional authority, while both Blumenfeld and Croce thought of Gray as the "office manager." The Asset Purchase Agreement describes Gray as a "former" vice president and lists his title for the relevant period as "director of cardiac testing services." The location of Gray's office on the "management side of the building" is not particularly probative of Gray's actual authority. Second, as to whether Gray owned shares or possessed an entrepreneurial stake in CAT: Gray's ownership of stock in the company is disputed, as he states that he never received the shares promised him as part of his employment agreement. Ostrov's declaration supports this assertion.

14

Third, as to whether Gray was active in the management of day-to-day affairs: The record supports a finding that Gray was involved in the day-to-day affairs of the company, but Gray's affidavit, supported by the affidavit of Ostrov, states that he only made decisions as ordered by other members of the management, and that all of his decisions had to be first approved by other members of the management (though, as noted above, the fact that Gray did not have ultimate decision-making authority does not itself preclude a finding that he was a responsible person). Fourth, as to Gray's ability to hire and fire employees: Blumenfeld and Croce both testified that Gray had the ability to hire and fire employees, though Gray asserts that only Goodman could hire and fire managerial employees. Ostrov states that Gray did not have a role in hiring and firing decisions. Fifth, as to Gray's ability to make decisions regarding payment of debts or taxes: Schick and Ostrov both state that Gray did not have authority to determine which, and in what order, creditors should be paid. Sixth, as to Gray's control over daily bank accounts and disbursement records: Gray concedes one occasion in which he opened a bank account for the company and the United States' documentary evidence suggests Gray exercised some control over purchase orders, though Gray states he did this only with approval from management. Seventh, as to check-signing authority: Gray concedes he was able to sign checks (and the United States produces many checks that he signed); however, he testified that he only signed checks when he was specifically told to do so by Schick. As the parties dispute facts underlying each one of the foregoing relevant factors, none weighs conclusively in favor of either party.

In <u>Sckoczylas v. United States</u>, No. 09 Civ.2035(ILG)(RML), 2012 WL 5995724 (E.D.N.Y. Dec. 3, 2012), Sckoczylas and the United States similarly brought cross-motions for summary judgment on § 6672 liability. <u>Id.</u> at *1. It was undisputed that Sckoczylas was a

member of the company's board of directors, had a 100% controlling share in the company, but was not active in day-to-day management. Id. at *7. The parties disputed, however, whether Sckoczylas actually had the power to hire and fire employees, control daily bank account records, and sign checks. Id. at *7-8. The court noted specifically that while Sckoczylas' name was printed on payroll checks, the parties disputed whether this fact showed actual control over the company's checkbook and bank accounts or simply "the ministerial act of signing the checks." Id. at *8. The court held that, given these disputed facts underlying the factors relevant to significant control, summary judgment for either party was inappropriate. Id. at *8-9. Similarly, in Winter, 196 F.3d 339, the Second Circuit reversed a grant of summary judgment for the United States, where the district court had found an individual named Romer was a responsible person under the statute. Id., at 346. Although the United States introduced evidence that Romer was an officer, director, and shareholder of the company and had check-signing authority, she introduced evidence that her title and ownership interest did not translate into actual control, and she never signed checks without the knowledge or consent of other managers. Id. The Second Circuit held, "indulging all reasonable inferences in favor of . . . Romer, there exists a genuine issue of fact as to whether she exercises 'significant control' over [the company's] finances or merely enjoyed a 'titular designation' at the company." Id. (citing Rem, 38 F.3d at 644).

Here, even Gray's titular designation and ownership interest are in question. While the United States has produced some evidence indicating that Gray possessed control over certain aspects of CAT's business, Gray has produced evidence suggesting that the real authority over the company's operations and, more importantly, its finances, was in the hands of other individuals. "Resolution of this dispute requires the kinds of credibility determinations and

assessments of conflicting evidence that a properly the province" of the fact-finder. Reiff v. United States, 461 F. Supp. 2d 142, 151 (S.D.N.Y. 2006) (denying summary judgment where "all but two of the Fiataruolo factors . . . . are disputed"); see also Rem, 38 F.3d at 645 (reversing grant of summary judgment motion where non-movant asserted that his check-signing authority was "sharply limited" and such assertion was supported by defendant's "own deposition testimony, his own affidavit, and the affidavit of" a former manager of the company).[4]  Such determinations cannot be made by the court on summary judgment.

Accordingly, viewing the evidence in the light most favorable to Gray, there plainly exists a genuine issue of fact as to whether he exercised significant control over CAT's finances such that summary judgment for the United States would be unwarranted.  By the same token, "[w]hen the evidence is viewed in the light most favorable to the government, these same genuine issues of fact exist," Winter, 196 F.3d at 346, thus precluding a finding that Gray was not a responsible person as a matter of law.  See id.  As genuine issues of fact exist with respect to Gray's status as a responsible person, summary judgment on this issue must be denied for both parties.

      (b)    *Willfulness*

Summary judgment may be granted as to the willfulness element of § 6672 liability even if denied as to the responsible person element.  See, e.g., Rem, 38 F.3d at 646.  As discussed

---

[4]Section 6672 cases in which courts of this circuit have granted summary judgment to the United States are easily distinguishable, as they tend to involve fact scenarios in which all of the relevant factors point to the individual in question being a responsible person under the statute. See, e.g., Bergman v. United States, No. 05-CV-0180 (DLI)(RML), 2007 WL 2071547, at *6 (E.D.N.Y. Jul. 16, 2007) ("All Fiataruolo factors are present in this case to plaintiff's detriment."); United States v. Sage, 412 F. Supp. 2d 406, 412-13 (S.D.N.Y. 2006) (granting summary judgement to United States where all factors are "present . . . to Sage's detriment").

17

above, willfulness in this context turns on knowledge. The testimony of Magrill, Blumenfeld, and Croce about Gray's responsibility for opening the company mail, handling payroll issues, and fielding calls from creditors, as well as Gray's own testimony that he was aware of bounced payroll checks, suggests he had the requisite knowledge that CAT had cash flow problems and was not remitting its withholding taxes to the IRS. Gray, however, denies in his affidavit that he was responsible for opening mail, ever opened any mail from the IRS, or fielded any calls from creditors. While Gray's affidavit is no doubt "self-serving," as the government describes, in that it serves his case, the credibility of Gray's claims must be evaluated by the fact-finder at trial, not on summary judgment. As to the bounced payroll checks, there is no dispute that Gray was aware that some payroll checks, including his own, were not honored, but this, by itself, does not indicate knowledge that CAT was not paying its debts to the IRS. Accordingly, because a genuine issue of fact exists as to Gray's willfulness, both parties' motions for summary judgment on this issue must be denied.[5]

## CONCLUSION

For the foregoing reasons, both parties' motions for summary judgment are denied. The parties shall return to Judge Levy for a settlement conference. If settlement cannot be reached,

---

[5]In its reply brief, the United States also states, "In his opposition to summary judgment, Gray contends that he is entitled to credits against his assessed trust fund recovery penalty for payments made to the United States by 'other sources' . . . . Gray's contention is both wrong and unsupported by any evidence." United States' Opp'n to Def. Gray's Cross Mot. for Summ. J. As Well As Reply Re: United States' Mot. for Summ. J., Dkt. #56, 4. Gray's submissions, Dkt. #54, 54-2, however, contain no argument with respect to credits. Consequently, the court does not address this issue.

the parties shall prepare for trial.

SO ORDERED.

s/ ARR
_____
Allyne R. Ross
United States District Judge

Dated: June 6, 2013
       Brooklyn, New York

19

**Service List:**

Mark Gray
872 East 27th Street
Brooklyn, NY 11210